# EXHIBIT D

DECLARATION OF TERRENCE COONEY

*April Fox v. Blue Cross Blue Shield of Michigan Long Term Disability Program*

Case No. 2016-cv-01467

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| April Adriana Fox, Plaintiff, ) | |
| ) | |
| v. ) | Case No. 16-cv-01467 |
| ) | Hon. Robert J. Jonker |
| Blue Cross Blue Shield of ) | |
| Michigan, Defendant. ) | |

### DECLARATION OF TERRENCE J. COONEY

I, Terrence J. Cooney, pursuant to 28 U.S.C. §1746, declare under penalty of perjury that the statements set forth below are true and correct:

1. I serve as Vice President-NEBA of Blue Cross and Blue Shield Association ("BCBSA"), in which capacity I supervise all operations of BCBSA's National Employee Benefits Administration Department (NEBA). In that capacity I also support the work of the National Employee Benefits Committee (NEBC) and serve as an NEBC Assistant Secretary.

2. The NEBC serves as the ERISA plan administrator and the ERISA named fiduciary for the employee benefit programs of the independent Blue Cross and Blue Shield companies that elect to utilize the employee benefit management services offered by BCBSA through NEBA (Participating Blue Plans), including the self-insured long term disability programs that Participating Blue Plans maintain through participation in the Blue Cross and Blue Shield Association Legacy Long Term Disability Program, formerly known as the Blue Cross and Blue Shield Association Long Term Disability Program (the "LTD Program").

3. Among the responsibilities of the NEBC is supervision of the LTD Program administrative support that NEBA provides. An important aspect of this responsibility is final

1

appellate review of NEBA benefit decisions that are appealed under the LTD Program's ERISA claims procedure. In the conduct of such appeals, the NEBC acts through its Assistant Secretaries.

4. The ERISA claims procedure appellate decision to uphold NEBA's denial of the disability benefit entitlement the Plaintiff seeks in April Fox in *Fox v. Blue Cross Blue Shield of Michigan*, (WD Mich., Case No. 16-cv-01467) was made on the NEBC's behalf on May 18, 2016 by Sharon Keyes, one of the NEBC's Assistant Secretaries. This appellate decision was reached after Ms. Fox made full use of her available ERISA claims procedure rights. In those deliberations, Ms. Fox was represented by an attorney.

5. In the letter advising Ms. Fox's attorney of the NEBC's decision to uphold the denial of her claim, Ms. Fox was provided with a detailed description of all documents and other material and information that constitute the administrative record of her ERISA claims procedure appeal (Administrative Record), all of which were then or were previously either supplied to her or supplied by her or her representatives. The three thumb drives labeled AdRec1, AdRec2 and AdRec3 (Thumb Drives) that are being provided to counsel of record for the Defendant in *Fox v. Blue Cross Blue Shield of Michigan*, (WD Mich., Case No. 16-cv-01467), Mr. Benjamin W. Jeffers of the Hickey, Hauck, Bishoff & Jeffers, PLLC, each contain identical sets of documents and other materials which constitute true and correct copies of the Administrative Record of Ms. Fox's LTD Program ERISA claims procedure appeal.

6. The Thumb Drives have been supplied to Mr. Jeffers at the request of his client, the Blue Cross and Blue Shield of Michigan (Defendant). During her employment by Defendant, Ms. Fox was a participant in the LTD Program by virtue of Defendant's participation as a plan sponsor for its employees in the LTD Program. As plan sponsor, Defendant is entitled to access

FOX_AR_007339

to these records for plan administration purpose, a consideration that is reinforced by the fact that effective June 1, 2016 the portion of the LTD Program that applied to employees and former employees of the Defendant, including both assets and liabilities, were spun off from the LTD Program to a newly established long term disability program maintained by Defendant. In connection with this spinoff, assets that related to coverage of Defendant's present and former employees that were previously held by the trustee of the Internal Revenue Code Section 501(c)(9) voluntary employees benefit association (VEBA) trust funding the LTD Program were transferred to the trustee of a VEBA established by Defendant. A true and correct copy of the spinoff amendment to the LTD Program is attached as Exhibit A

7. Because the Administrative Record contains private information about Ms. Fox including medical information, and because this information was central to the adjudication of her appeal, the contents of the Thumb Drives have not been redacted, but the Thumb Drives have been encrypted and have been provided to Mr. Jeffers with the understanding that the Defendant will offer the Thumb Drives for filing under seal in *Fox v. Blue Cross Blue Shield of Michigan*, (WD Mich., Case No. 16-cv-01467) pursuant to FRCP Rule 5.2(d). To facilitate this use of the Thumb Drives without compromising the information, each has been labeled for identification and Mr. Jeffers is being provided with the instructions for accessing the encrypted files on the Thumb Drives and the passphrase required by those instructions.

8. The members of the NEBC, its Assistant Secretaries and BCBSA have no financial responsibility for the benefits payable under the LTD Program. All benefits are solely obligations of the VEBA trust funding those benefits. VEBA trust assets consist of contributions by the Participating Blue Plans and VEBA trust investment earnings.

FOX_AR_007340

9. Only one member of NEBC is an executive of BCBSA. All others are Executives of Participating Blue Plans. At no time during the pendency of Ms. Fox's claim and appeal did any employee or other representative of the Defendant serve as of member of the NEBC.

10. Provisions of the LTD Program documents (which documents are included on the Thumb Drives as a part of the Administrative Record) broadly grant fiduciary discretion to the NEBC and its delegates, the Assistant Secretaries, to render decisions regarding benefits under the LTD Program. Similar broad grants of fiduciary discretion are included in provisions of the NEBC's Charter that was ratified by the Participating Blue Plans, a true and correct copy of which is attached as Exhibit B

The undersigned, Terrence J. Cooney, hereby declares under penalty of perjury that the statements set forth above are true and correct and that the attachments are true and correct copies of Exhibits A and B referred to therein.

*Terrence J. Cooney*
Terrence J. Cooney
Assistant Secretary of
National Employee Benefits Committee and
Vice President-NEBA of
Blue Cross and Blue Shield Association

Date: February 3, 2017

4

Exhibit A

AMENDMENT AGREEMENT

regarding the

SPINOFF OF THE PORTION

of

BLUE CROSS AND BLUE SHIELD ASSOCIATION LEGACY
LONG TERM DISABILITY PROGRAM

applicable to

BLUE CROSS AND BLUE SHIELD OF MICHIGAN PARTICIPANTS

and

CONTINUATION OF THE SPUN OFF PROGRAM

as

BLUE CROSS AND BLUE SHIELD OF MICHIGAN
LONG TERM DISABILITY PROGRAM

WHEREAS, Blue Cross and Blue Shield of Michigan (BCBSMI) currently maintains a long term disability program for its eligible employees through participation in the Blue Cross and Blue Shield Association Legacy Long Term Disability Program (formerly known as the Blue Cross and Blue Shield Association Long Term Disability Program)(the "Prior Program"); and.

WHEREAS, the Prior Program is maintained by the National Employee Benefit Administration department ("NEBA") of Blue Cross and Blue Shield Association ("BCBSA") for the benefit of BCBSMI participants and participants employed by certain other BCBSA licensee Plans or their controlled affiliates; and

WHEREAS, a BCBSA committee, the National Employee Benefit Committee ("NEBC"), serves in dual discretionary capacities as the plan administrator and named fiduciary and as the Program's settlor as a representative of the Participating Plans; and

WHEREAS, in its settlor capacity the NEBC intends to exercise its authority to terminate the Prior Program, effective, December 31, 2016, or as soon thereafter as administratively feasible; and

WHEREAS, BCBSMI wishes to continue its portion of the Prior Program as a spun off standalone program for the benefit of its eligible participants and the NEBC has agreed to such spin off and continuation of the program and NEBA has agreed to continue to provide certain administrative support to the spun off program for a period of time following such spin off;

NOW, THEREFORE, IT IS AGREED, pursuant to the authority reserved to the NEBC by Section 7.1 of the Prior Program and the authority delegated to the undersigned officer of BCBSMI by the BCBSMI Board of Directors, that the portion of the Prior Program applicable to

FOX_AR_007342

BCBSMI participants be and it is hereby amended and continued in the form of the attached spun off program document, effective June 1, 2016, which spun off program document shall be known as the Blue Cross and Blue Shield of Michigan Long Term Disability Program (the "New Program"); and

IT IS FURTHER, AGREED, that by separate amendment documents, also effective June 1, 2016, BCBSMI and the NEBC and BCBSMI shall amend the portion of the Voluntary Employee Benefits Association (the "Prior VEBA") and the portion of the trust funding the Prior VEBA (the "Prior Trust") into the form of a spun off Voluntary Employee Benefits Association (the "New VEBA") and a spun off trust (the "New Trust"); and

IT IS FURTHER AGREED that, as provided in the New Program, New VEBA and New Trust documents, the liabilities of the Prior Program, the Prior VEBA and the Prior Trust for benefits of BCBSMI Participants shall become liabilities of the New Program, the New VEBA and the New Trust, effective June 1, 2016; and

IT IS FURTHER AGREED that, as provided in the attached New Program, the New VEBA and the New Trust documents, assets of the Prior Trust shall be transferred to the trustee of the New Trust as follows:

(i) All asset and liability calculations shall be as of June 1, 2016, provided that any asset transfers required to be made after that date pursuant to subparagraph (vi) below shall be adjusted to reflect the Prior VEBA's rate of earnings during the period since June 1, 2016.

(ii) Subject to adjustments described in subparagraph (vi) below and any earnings rate adjustment credited or charged pursuant to subparagraph (i) above, once all transfers are completed the assets transferrable to the trustee of the New Trust shall equal:

    a. the value of the liabilities transferred to the New Program, the New VEBA and the New Trust in accordance with the immediately preceding paragraph of this Agreement; multiplied by

    b. the BCBSMI funded percentage as determined by the Prior Program's independent actuary.

(iii) As soon as practicable after May 31, 2016, the NEBC shall cause assets to be transferred from the trustee of the Prior Trust to the Trustee of the New Trust in an amount equal to at least 80 percent of the amount then estimated by the Prior Program's actuary as the amount described in subparagraph (ii) above.

(iv) No later than March 31, 2017, the NEBC shall cause the independent actuary for the Prior Program to finalize its calculation of the amount described in subparagraph (ii) above.

FOX_AR_007343

(v) No later than April 1, 2017, NEBA shall notify BCBSMI of the following adjustments to the amount determined in subparagraph (iv):

    a. If there is a shortfall in the assets in the Prior Trust available to pay benefits of disabled participants employed by legacy employers who withdrew without a transfer of liabilities prior to September 1, 2015, the amount determined in accordance with subparagraph (iv) shall be decreased by any amount that the Prior Program's independent actuary determines is attributable to BCBSMI's proportionate share of such shortfall.

    b. If there is an excess in the assets in the Prior Trust available to pay benefits of disabled participants employed by legacy employers who withdrew without a transfer of liabilities prior to September 1, 2015, the amount determined in accordance with subparagraph (iv) shall be increased by any amount that the Prior Program's independent actuary determines is attributable to BCBSMI's proportionate share of such excess.

    c. The amount determined in accordance with subparagraph (iv) shall be decreased by any fees or expenses that NEBA determines are chargeable to BCBSMI or relate BCBSMI's allocable portion of the Prior Program, unless BCBSMI elects to pay such expenses directly.

(vi) Following the calculation of the amount described in subparagraph (iv) and completion of all adjustments described in subparagraph (v):

    a. If the amount in subparagraph (iv), as adjusted, exceeds the amount determined in subparagraph (ii), the NEBC shall cause the trustee of the Prior Trust to promptly transfer such excess to the trustee of the New Trust; or

    b. If the amount in subparagraph (iv), as adjusted, is less than the amount determined in subparagraph (ii), BCBSMI shall cause the trustee of the New Trust to promptly transfer such shortfall to the trustee of the Prior Trust

EXECUTED as of the dates indicated below by the undersigned duly authorized representatives of the National Employee Benefits Committee and Blue Cross and Blue Shield of Michigan

| NATIONAL EMPLOYEE BENEFITS COMMITTEE | BLUE CROSS AND BLUE SHIELD OF MICHIGAN |
|---|---|
| By: _[signature]_ | By: _[signature]_ Darrell E. Middleton |
| Its: Assistant Secy<br>Dated May 11, 2016 | Its: EVP, Ops & Business Perform<br>Dated December 1, 2016 |

FOX_AR_007344

EXHIBIT B



CHARTER
of the
BLUE CROSS AND BLUE SHIELD ASSOCIATION
NATIONAL EMPLOYEE BENEFITS COMMITTEE
(as amended effective January 1, 2016)

ARTICLE ONE
Introduction

Section 1.    NEBC, National Programs and Participating Programs.    As provided in greater detail below, the Blue Cross and Blue Shield National Employee Benefits Committee (the "NEBC") is a committee established by the Blue Cross and Blue Shield Association ("BCBSA") to oversee the administration and investment of employee benefit and related programs maintained by the BCBSA for the benefit of its employees and for the benefit of employees of its licensee Plans (the "Plans") and their controlled affiliates that have elected to maintain such programs (collectively with BCBSA and its programs, the "Participating Plans" and the "Participating Programs") through participation in national programs ("National Programs") administered by BCBSA's National Employee Benefits Administration ("NEBA").

Section 2.    History and Charter Effective Date    The NEBC (originally known as the Blue Cross Association Retirement Committee) has performed its supervisory duties regarding National Programs since its formation in 1953. Prior to June 20, 2013, the NEBC was a standing committee of the BCBSA Board deriving its authority from the BCBSA bylaws and from a formal Charge to it from the BCBSA Board. Pursuant to resolutions of the BCBSA Board adopted June 20, 2013 (a copy of which is attached as Exhibit A), the NEBC ceased to be a standing committee of the BCBSA Board and the BCBSA Board transferred its authority regarding the Participating Programs and the National Programs to the NEBC, including the authority to establish the rules and procedures governing the NEBC's operations that are contained in this Charter or future amendments thereto (the "Charter"). This Charter took effect on the June 20, 2013, the date such authority transfer resolutions were approved by the BCBSA Board (the "Initial Effective Date"). The grant of authority to the NEBC pursuant to the Charter was ratified by the Participating Plans in early 2014. The Charter as set forth below is a restatement of the Charter as in effect on the Initial Effective Date, which restatement reflects clarifying, simplifying and procedural amendments adopted by the NEBC effective as of January 1, 2016 (the "Effective Date") pursuant to its authority to "establish rules and procedures relating to the governance of the NEBC and the conduct of its deliberations" granted to the NEBC by the BCBSA Board resolutions in Exhibit A.

FOX_AR_007345

National Employee Benefits Committee Charter
Page 4

    (e)    **Death.** Membership on the NEBC shall cease upon the date of death of a member.

    **Section 7.**    **Selection of Members.**    Subject to the eligibility requirements and the size limitations of Section 4, members of the NEBC shall be selected as follows:

    (a)    **Ex Officio Member.** The BCBSA Chief Executive Officer or his or her designee shall serve as an ex officio member of the NEBC;

    (b)    **Other Members.** The BCBSA Chief Executive Officer shall approve the appointments of all other NEBC members from among Senior Executives or former Senior Executives of Participating Plans nominated by the Chair of the NEBC as follows:

        i.    **Nomination of Large Plan Designees.** Each Participating Plan that maintains at least one Participating Program covering at least 5,000 participants shall be entitled to, but shall not be required to, designate one of its Senior Executive Officers or former Senior Executive Officers to serve on the NEBC. Upon receipt of notification of such designation, the Chair of the NEBC shall nominate such designee to serve as a member of the NEBC.

        ii.    **Other Nominations.** As he or she deems necessary, from time to time, the Chair of the NEBC shall nominate Senior Executive Officers or former Senior Executive Officers of Participating Plans other than the Participating Plans described in Section 7(b)(i) to serve on the NEBC. In the exercise of such discretion, the Chair of the NEBC may, but shall not be required to, appoint and consult with a Nominating Subcommittee he or she selects from among the other members of the NEBC. In making nominations under this Section 7(b)(ii), the Chair shall place a priority on affording a preference to nominees from Participating Plans not then or previously represented on the NEBC.

    **Section 8.**    **NEBC Chair and Vice Chair.**    From time to time, the BCBSA Chief Executive Officer shall designate a member of the NEBC to serve as its Chair to serve for such period as may be determined by the BCBSA Chief Executive Officer. The NEBC Chair may select another member of the NEBC to serve as his or her Vice Chair.

    **Section 9.**    **NEBC Secretary and Assistant Secretaries.**    By majority vote, the NEBC shall select a Secretary and Assistant Secretaries to perform the responsibilities delegated to them by this Charter, by the Participating Program and National Program documents or by resolutions of the NEBC. Persons selected to serve as Secretary or as Assistant Secretaries may be, but need not be, members of the NEBC.

    **Section 10.**    **No Compensation.**    Members of the NEBC who are full-time employees

FOX_AR_007346

National Employee Benefits Committee Charter
Page 5

of BCBSA or any Participating Plan shall serve without compensation from BCBSA or from any of the National Programs for such service. No Members of the NEBC shall be entitled to any compensation from Participating Program or National Program assets. However, subject to guidelines set by the BCBSA executive responsible for managing NEBA's operations in consultation with legal counsel and BCBSA's internal audit department, NEBC members who are not otherwise entitled to such reimbursement from any other source may be reimbursed for reasonable expenses incurred on behalf of the NEBC.

## ARTICLE FOUR
## NEBC Procedures

**Section 11.   Action by NEBC.**   The NEBC may act by meeting or by documents signed without meeting. Documents executed by or on behalf of the NEBC may be signed through the use of a single document or concurrent documents. Action required to be taken or permitted to be taken by the NEBC may be taken by resolution or other recorded action of the NEBC or any of its duly authorized subcommittees or by documents signed by a person or persons authorized by such a resolution or recorded action. Ordinarily documents executed on behalf of the NEBC shall be executed on its behalf by its Secretary or one of its Assistant Secretaries. Persons dealing with the NEBC may reasonably rely upon documents signed on behalf of the NEBC by persons they reasonably believe to be the Secretary or an Assistant Secretary of the NEBC based upon specimen signatures previously supplied to them by or on behalf of the NEBC and certified by persons they know to be the Secretary or an Assistant Secretary of BCBSA.

**Section 12.   Deliberations.** The NEBC shall meet as often as it deems necessary and appropriate in its judgment, but not less than four times per calendar year. The following procedures shall apply in the conduct of NEBC deliberations:

(a) **Electronic Deliberations.** The Committee may hold meetings by telephone or the use of other electronic media so long as all members can be identified to each other and all members participating in the meeting may hear each other.

(b) **Quorum.** A majority of the Committee as constituted at any time shall constitute a quorum. Contrary to the normal application of Robert's Rules of Order to ex officio members, the Chief Executive Officer of BCBSA (or his or her designee serving as an ex officio NEBC member) shall be taken into account in determining the presence of a quorum and shall be entitled to the same voting rights as any other NEBC member.

(c) **Majority Action.** Any decisions, authorizations or others actions by a majority of the NEBC members present at any meeting, or authorized by written unanimous consent of the members without a meeting, shall constitute an action of the NEBC. Decisions, authorizations or other actions taken in a meeting by majority decision shall be as effective as if such decision, authorization or other actions

198/208

FOX_AR_007347

National Employee Benefits Committee Charter
Page 6

had been taken by all members;

(d) **Recusal or Abstention.** A member of the NEBC shall refrain from participation in NEBC deliberations by recusal in the circumstances described in Section 12(d)(i) and may do so through abstention as described in Section 12(d)(ii):

    i. **Recusal.** A member shall recuse himself or herself from acting in his or her capacity as an NEBC member in deciding or determining any matter that solely relates to a Participating Program in which such member or a member of his or her immediate family may have an interest as a program participant or in deciding any other matter where he or she believes he or she has or may appear to have a conflict of interest. If the deliberations involve decisions relating to a vendor or other party with respect to which the member believes he or she may have an ongoing conflict of interest or may appear to have such a conflict, the member may inform the NEBC of his or her standing recusal regarding such matters. Nothing in this Section 12(d)(i) shall prevent an NEBC member from making any decision or election which he or she could make simply as a Participating Program participant even if he or she were not serving as a member of the NEBC. Moreover, nothing in this Section 12(d)(i) shall preclude such NEBC member from participating in decisions regarding his or her Participating Plan's Participating Programs when acting in any capacity other than his or her capacity as an NEBC member.

    ii. **Abstention.** Any member may elect to abstain from acting in his or her capacity as a NEBC member in deciding or determining any matter for any reason.

(d) **Minutes.** The Secretary or an Assistant Secretary shall submit draft minutes and certify approved minutes of NEBC deliberations other than Executive Session deliberations which shall be prepared and, when approved, certified by counsel for the NEBC.

(e) **Consent Calendar.** The Chair may submit matters for deliberation on a consent calendar if: (i) the NEBC members have received materials sufficiently in advance to review those matters; (ii) the Chair reasonably believes, based upon the routine nature of those matters or due to other factors, that the NEBC members will be able to fully deliberate regarding those matters without additional discussion based upon their prior review of those materials; and (iii) any member is permitted to request any matter be removed from the consent calendar.

199/208

FOX_AR_007348

        the Chair shall appoint other members as necessary to assure that neither member of a Claims Review Group is an employee of the Participating Plan that employs or employed the participant whose benefits are at issue in the appeal.

    iii.   **Scope of Claims Adjudication Authority.** The NEBC and its delegates, NEBA, the CRG and an Assistant Secretary, shall have complete fiduciary discretion to adjudicate all issues raised by a participant on the administrative record of his or her claim and appeal, whether based upon the terms of the relevant Participating Program documents or on another theory, including but not limited to external context, estoppel, waiver, reformation or fiduciary theories.

    iv.   **Reliance on Records of Participating Plans.** The NEBC and its delegates, NEBA, the CRG and an Assistant Secretary, shall be entitled to rely on information supplied by the Participating Plans, BCBSA, NEBA, trustees, investment managers, insurance institutions, accountants, and other professionals including legal counsel when making a determination or interpretation described in this Section 13(d) or any other fiduciary decision described in the Charter.

    v.   **Authorize Benefit Payments.** Whenever NEBA determines a benefit is payable to or for the benefit of a participant or such a determination is made by the NEBC or its delegate upon an appeal, NEBA shall direct the trustee of the applicable trust to make such benefit payment.

    vi.   **Complete Fiduciary Discretion.** The powers, rights, duties and authorities delegated to the NEBC and its delegates, NEBA, the CRG and an Assistant Secretary, in accordance with this Section 13(d) or any other provision of this Charter shall be exercised by the NEBC or such delegate, as the case may be, in their sole discretion. Benefits under an applicable program will be paid or provided to a claimant only if NEBA (or the CRG and an Assistant Secretary, as the case may be, in the event of an appeal) decides in his, her or its discretion that the claimant is entitled to them.

(e)   **Litigation.** The NEBC shall have the authority to direct the defense of any action concerning a National Program or any Participating Program. In routine benefit claim or overpayment actions, the NEBC previously has delegated, and under this Charter shall continue to delegate, decisions regarding the defense or prosecution of civil litigation to NEBA and counsel to the NEBC, subject to NEBC oversight. The NEBC retains the responsibility for directly authorizing the defense or prosecution of other disputes and will ordinarily deliberate regarding such matters in Executive Session.

(f)   **Participant Communications & Web Sites.** The NEBC has in the past

National Employee Benefits Committee Charter
Page 11

delegated, and under this Charter shall continue to delegate, to NEBA and the Participating Plans, its duties to prepare and distribute to participants required communications and communications deemed by NEBA to be appropriate and helpful to keeping participants fully informed of their benefits under the Participating Programs. Unless otherwise agreed, ordinarily Participating Employers shall be responsible for distribution of such communications prepared by NEBA to active employees and NEBA shall be responsible for distribution to inactive participants, beneficiaries and alternate payees. Subject to NEBC oversight, the NEBC has in the past delegated, and under this Charter shall continue to delegate, to NEBA the responsibility to contract with appropriate vendors or otherwise maintain web sites or other electronic communication channels for use by participants in obtaining information about the National Programs and their Participating Programs.

(g) **Governmental Filings and Reports.** The NEBC has in the past delegated, and under this Charter shall continue to delegate, to NEBA and the Participating Plans, its duties to complete all governmental filings and reports that are either required or advisable. Likewise, the NEBC has in the past delegated to, and under this Charter shall continue to delegate to, NEBA and the Participating Plans, its duties to complete all governmental filings and reports that are either required or advisable.

(h) **Maintenance of Program Records.** The NEBC has in the past delegated, and under this Charter shall continue to delegate, to NEBA the responsibility for maintenance of the records that will be needed to administer the National Programs and the Participating Programs and to determine the benefits participants may be entitled thereunder.

(i) **Financial Oversight of Program Operations.** The NEBC has in the past determined that centralized procurements and support for the National Programs and the Participating Programs through the efforts of NEBA and BCBSA is in the best interests of participants and the Participating Programs. Each Participating Plan has made the same determination by voluntarily electing to participate in the National Programs. As permitted by Section 408(b)(2) and 408(c)(2) of ERISA, the NEBC shall continue to delegate the responsibilities described in this Charter to NEBA and may delegate additional responsibilities to NEBA by subsequent NEBC action. The NEBC has in the past supervised, and under this Charter shall continue to supervise, NEBA's cost reimbursements for performing the responsibilities delegated to it by the NEBC or by this Charter. Such supervision shall continue to include review of proposed NEBA budgets and cost reimbursements and supervision of NEBA procurement standards and practices. At least twice each year, in conjunction with BCBSA's budget cycles and in connection with completion of the annual National Program audits, the NEBC shall present a written report to the BCBSA Board's Finance and Audit Committee regarding NEBA's financial operations.

FOX_AR_007350

(j) **Reporting to the BCBSA Board and to Participating Plans.** At least once each year the NEBC shall provide the BCBSA Board with a written report regarding its performance of its obligations under the National Programs and the Participating Programs. Similarly, at least once each year the NEBC shall provide each Participating Plan with a written report regarding its performance of its obligations under that Participating Plan's Participating Programs.

(k) **NEBC's Authority to Authorize National Tax Savings Program Participation by Certain Other Employers.** Notwithstanding the participation restrictions set forth in Section 1 or Section 13(c), the NEBC may approve participation in a National Tax Savings Program Participating Program by an employer that is neither a licensee Plan nor a controlled affiliate of a licensee Plan. As a condition to the commencement or continuation of such participation, all of the following requirements must be satisfied:

    i. The Participating Program is a tax qualified 401(k) program that is either limited to employers who are in a controlled group of companies or such program satisfies the requirements applicable to a multiple employer program;

    ii. A licensee Plan or a controlled affiliate of a licensee Plan participates in the Participating Program and by agreements with the other participating employers and NEBA that licensee Plan or a controlled affiliate serves as the lead Participating employer responsible for performing the duties of Program Sponsor, including reporting a relevant data reasonably requested by NEBA and assisting NEBA in fulfilling all participant communications responsibilities; and

    iii. The licensee Plan or a controlled affiliate described in Section 13(k)(ii) and the other participating employers satisfy all other requirements specified by the NEBC as a condition to such participation.

**Section 14. Allocation of Duties to Subcommittees and Claims Review Groups.** Pursuant to its authority to act through subcommittees or other persons or entities described in Section 11 and its authority to allocate responsibilities described in Section 13, the NEBC performs certain of its responsibilities through subcommittees and Claims Review Groups. Without modifying the NEBC's reserved authority pursuant to those provisions to modify, expand or restrict the responsibilities or authority of any subcommittee, persons or entities or to establish additional subcommittees or abolish any subcommittees by resolution or other NEBC action, the following subcommittees and Claims Review Groups have been established or will be appointed to perform the functions described in this Section 14:

(a) **Investment Subcommittee.** By resolution adopted November 17, 2004, the NEBC established the Investment Subcommittee as a standing subcommittee to

FOX_AR_007351

National Employee Benefits Committee Charter
Page 13

assist the NEBC in engaging "in even more extensive supervisory evaluations of its Investment Professionals, including activities that will require more frequent action." The Investment Subcommittee has since that time performed the functions anticipated in that resolution, including previewing "presentations by Investment Professionals and in other ways ... engage[ing] in preliminary activities that ... enrich the Committee's deliberations regarding investment issues." Except to the extent modified or superseded by subsequent action by the NEBC, the Investment Subcommittee shall conduct its deliberations on behalf of the NEBC as follows:

i.  **Composition of Investment Subcommittee.** The Investment Subcommittee shall consist of three to five members of the NEBC selected by the Chair of the NEBC following consultations with other members of the NEBC. In making such selections, the Chair of the NEBC shall consider all factors he or she deems relevant, including experience with financial markets and investment instruments of the types likely to be considered for investment of the assets of the Programs and Trusts described in Section 13(b). The Chair shall also designate the Vice-Chair of the NEBC or another member of the NEBC serving on the Investment Subcommittee to serve as Chair of the Investment Subcommittee.

ii. **Charge to the Investment Subcommittee.** In addition to continuing to serve its original charge from the NEBC to report to the NEBC "regarding such matters relating to Program investments as it deems appropriate," the Investment Subcommittee shall assist the NEBC in the performance of its investment duties described in Sections 13(b) and 13(e) by performing the following specific functions on the NEBC's behalf:

   A. **Investment Policy.** The Investment Subcommittee shall from time to time initiate reviews of the investment policies applicable to the Programs and Trusts described in Section 13(b) and make any recommendations to the NEBC it deems appropriate regarding those investment policies, including recommendations regarding Program level, Participating Program level and investment fund or investment manager level asset allocations, targets, ranges and benchmarks.

   B. **Investment Manager, Investment Fund or Other Searches or Reviews.** The Investment Subcommittee shall from time to time initiate investment manager, investment fund, investment consultant, custodian or other performance reviews or searches and make any recommendations to the NEBC it deems appropriate regarding those reviews or searches.

   C. **Performance Reviews.** The Investment Subcommittee shall obtain

FOX_AR_007352

National Employee Benefits Committee Charter
Page 14

    performance reports for the Programs or Trusts described in Section 13(b)(i) and 13(b)(ii) at least quarterly and for the Trusts described in Section 13(b)(ii) at least annually.

  D. **Investment Education.** As it deems appropriate, the Investment Subcommittee shall engage in investment education activities with the assistance of the NEBC's investment consultant.

  E. **Monitor & Evaluate Investment Consultant.** From time to time, as it deems appropriate, the Investment Subcommittee shall review the performance of the NEBC's investment consultant and report to the NEBC regarding its assessment. In the event that the Investment Subcommittee considers it prudent to consider selection of alternative or additional investment consultants, it shall direct a search process and report its recommendations to the NEBC.

  F. **Additional Delegated Duties.** From time to time, the NEBC may delegate additional responsibilities to the Investment Subcommittee, which may include unilateral actions by the Investment Subcommittee taken on the NEBC's behalf.

(b) **Other Subcommittees or Groups.** The NEBC may establish other subcommittee or delegate responsibilities to other groups composed of NEBC members as it deems advisable. Such subcommittees or groups may serve as standing bodies or may be formed for specific purposes of short term duration. These shall include any Nominations Subcommittee the Chair elects to appoint as described in Section 7(b)(ii) and the Claims Review Groups described in Section 13(d)(ii) above.

(c) **Subcommittees or Group Deliberations.** Service by members of the NEBC on a subcommittee or group is an extension of their duties as members of the NEBC. Accordingly, except as expressly stated in this Section 14 or as specified in subsequent action by the NEBC, the members of the NEBC serving on a subcommittee or group shall conduct their deliberations in that capacity in the manner described in this Charter with respect to deliberations of the NEBC.

FOX_AR_007353